IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

WILLIAM H. JOHNSON )
)
v. ) No. 2:12-0099
) Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:     The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration") denying plaintiff's applications for disability insurance benefits and

supplemental security income, as provided under the Social Security Act.  The case is

currently pending on plaintiff's motion for judgment on the administrative record (Docket

Entry No. 14), to which defendant has responded (Docket Entry No. 16).  Plaintiff has

further filed a reply brief in support of her motion (Docket Entry No. 17).  Upon

consideration of these papers and the transcript of the administrative record (Docket Entry

No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's

motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.


## I.  Introduction

In October 2009, plaintiff filed his applications for benefits, alleging the onset

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

of disability as of December 31, 2001. (Tr. 11, 115-25) These claims were denied at the initial and reconsideration stages of agency review, whereupon plaintiff requested and received *de novo* hearing of his claims by an Administrative Law Judge (ALJ). The ALJ hearing was held on April 15, 2011, at which time plaintiff appeared with counsel and gave testimony. (Tr. 25-45) Testimony was also received from an impartial vocational expert (VE). At the conclusion of the hearing, the ALJ took the matter under advisement, until May 26, 2011, when he issued a written decision denying plaintiff's claims to benefits. (Tr. 11-19) That decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2007.

2.  The claimant has not engaged in substantial gainful activity since December 31, 2001, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: diabetes, obesity, osteoarthritis, degenerative disc disease, depression, personality disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that the claimant can do no climbing of ladders, ropes, and scaffolds; that the claimant is precluded from crawling; that the claimant is limited to occasional kneeling; that the claimant can perform other postural activities frequently; that the claimant can perform simple and detailed instructions but he cannot make decisions at the executive level; that the claimant will work better with things rather than people but this does not rule out interaction with the public, co-workers or supervisors; that the claimant can adapt to occasional changes in the

2

workplace; and that the claimant is precluded from working around unprotected heights and moving machinery.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 4, 1953 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a "disability," as defined in the Social Security Act, from December 31, 2001, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 13-15, 17-19)

On August 22, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-7), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II.  Review of the Record

The following record review is taken from defendant's brief, Docket Entry No. 16 at 2-11:

<u>Medical evidence</u>

1. Before DLI [(Date Last Insured)] on June 30, 2007

In January 2002, plaintiff had right knee stiffness and pain that worsened on weightbearing. Dr. Chertok found limited motion and crepitus (crackling sound). Also, the ankle was tender. There was no gross joint abnormality, radicular symptoms, or lower extremity edema. Plaintiff had normal strength in all extremities. He was depressed after his father's death, yet memory, judgment, and insight remained intact. Along with pain in the lower leg, ankle, and foot, Dr. Chertok assessed benign essential hypertension (130/90), dyslipidemia, sleep apnea, gastroesophageal reflux disorder (GERD), obesity, tobacco and alcohol abuse, and unspecified psychophysiological malfunction, depression, and anxiety. As depression was not being treated, and Dr. Chertok encouraged plaintiff to address it and reduce substance abuse. He prescribed a cortisone injection, medication, and physical therapy. Tr. 327-30, 332-33, 335-38, 340, 342. X-rays confirmed mild ankle abnormalities and moderate degenerative joint disease (DJD) in the right knee. Tr. 355-56; *see* Tr. 351. Plaintiff began knee treatments and responded well. In a few weeks, he felt "good," stronger, and was gardening and hanging siding. Also, Dr. Turnbull found normal gait, strength (4/5 to 5/5), and range of motion. Plaintiff had pain on prolonged sitting, stair climbing, and walking. Tr. 263-79, 311, 325, 352-54. Meanwhile, in early March 2002, plaintiff noted Vioxx "really" helped with leg and joint pain. Using alcohol, he was depressed. Dr. Jenkins observed rapid mental cycling and some psychomotor acute distress. He assessed, *inter alia,*

mild bipolar disorder. Adjusting medications, he advised plaintiff to take them instead of using alcohol. In a few days, plaintiff's mood returned to normal, and in late March he was calm and clinical findings were normal. Also, Dr. Jenkins adjusted medications after assessing, *inter alia,* joint pain in the lower leg, ankle, and foot; obesity; and unspecified psychophysiological malfunction, depression, and anxiety. Tr. 312-24, 331.

In May 2002, plaintiff weighed 320 pounds and complained of intermittent low back pain. Clinically, Dr. Chertok found paralumbar spasm and tenderness. He found normal strength in all extremities; normal neurologic signs (*e.g.,* gait and station, straight leg raising (SLR)); and no edema or gross joint abnormality. *Inter alia,* he assessed muscle spasm and prescribed medication and back exercises. He recommended weight loss saying that would delay needing knee replacements. Tr. 306-07, 335, 337, 346, 351; *see also* Tr. 310.

In April 2003, Dr. Mulaisho noted noncompliance with prescribed cholesterol medication and advised diet and exercise, while deferring further prescriptions. Tr. 292, 349-50. In May 2003, Dr. Chertok treated leg swelling. Plaintiff was drinking heavily and not taking medications. A clinical exam was normal, *e.g.,* musculoskeletal, strength, psychiatric. Dr. Chertok assessed, *inter alia,* edema, lower extremity joint pain, obesity, and alcohol abuse. He advised plaintiff to reduce salt and alcohol intake and prescribed medications. Additional tests and an electrocardiogram (EKG) were normal. Tr. 286-90; *see also* Tr. 291, 293-99, 335. In June 2003, Dr. Chertok assessed, *inter alia,* stable dermatitis and varicose veins with inflammation (lower extremities). He provided a psychological referral. Tr. 283-84, 335, 357-58, 492-93. In July 2003, Dr. Mulaisho prescribed cholesterol lowering medication. Tr. 347.

Next in February 2005, plaintiff was treated for headache and flank pain (zero,

scale of ten) at the emergency room (ER). Blood pressure was 185/110, and an EKG was abnormal. Plaintiff said he had no orthopedic problems, and an exam confirmed normal spinal, musculoskeletal, and neurologic findings. Also, mental status was normal. Hypertension medication was prescribed. Tr. 282, 494-501. In April 2005, plaintiff returned with high blood pressure (194/118) and swollen ankles. He again denied orthopedic problems and had a full range of motion and normal neurological and psychological findings. With medication, blood pressure went down to 150/96. Tr. 502-08. In July 2005, plaintiff returned with chest pain, nausea, shortness of breath and high blood pressure (166/94). He denied musculoskeletal problems. Acute chest wall pain was assessed. Tr. 510-23.

Next, in May 2007, Dr. Bolton examined plaintiff who was concerned about leg discoloration and made no pain complaints. He also said he was alcohol- and drug-free. The clinical exam was normal. Dr. Bolton assessed no musculoskeletal problems. He diagnosed impairments as stable dermatitis, diabetes, hypertension, dyslipidemia, sleep apnea, chronic venous insufficiency, and alcohol abuse (remission). Tr. 377-80.

2. From the October 14, 2009, SSI application filing[2]

In October 2009, plaintiff saw Dr. Cates for chronic left hip and groin pain (two or ten, scale of ten) that sometimes radiated to the buttocks or low back. Clinically, Dr.

---

[2]In September 2007, plaintiff had a pulled back muscle. Except for mild tenderness in the back, a clinical exam was normal. Dr. Bolton assessed improved diabetes, GERD, and minor chest wall strain. Tr. 373-76, 381-84; *see also* Tr. 385-86. In March 2008, plaintiff had right knee pain. A clinical exam showed mild crepitus (right knee) and Dr. Bolton assessed no musculoskeletal problems. Tr. 369-72; *see also* Tr. 387-90. In October 2008, plaintiff had shoulder and stomach pain. Dr. Bolton assessed left biceps tendon rupture and no musculoskeletal problem. Tr. 366-68; *see also* Tr. 391. In March 2009, plaintiff ambulated unassisted and without difficulty, and a clinical exam was normal. Dr. Bolton assessed diabetes, hypertension, hyperlipidemia and urinary frequency. Tr. 361-65, 442-45.

Cates found low back tenderness, negative SLR, and slow, difficult walking. Plaintiff had normal mental and neurological signs. Dr. Cates assessed left hip DJD and advised taking liquid glucosamine. Based on x-rays, he recommended a hip replacement. He did not prescribe an ambulatory assistive device or limit plaintiff's activities. Tr. 446-48, 393-400, 436-41.

In December 2009, consultative examiner (CE) Dr. Keown evaluated plaintiff. He reported always using a cane. He was six feet tall and 309 pounds. He stood up unassisted and with guarded effort. Hip motion caused discomfort and was reduced up to fifteen percent (flex 110 of 125 degrees, rotate 40 to 50 of 45, lateral raise 40 of 45). Knees and ankles moved normally, but knee joints had minor enlargement. Forward bending was 90 degrees, lateral 30, and backward 25. SLR was negative, and neurologic signs were normal. Plaintiff was witnessed moving better than when he was being formally observed, at which time he exaggerated and dramatized difficulty walking. Dr. Keown assessed stable, non-insulin dependent diabetes; DJD (hip, knee); obesity; GERD; sleep apnea; high cholesterol; substance abuse (history); and tobacco abuse. She opined plaintiff could frequently lift 50 pounds; occasionally lift 100; sit eight hours, stand six, and walk five without a cane during an eight-hour work day; frequently do postural movements; shop; travel independently; use standard public transportation; walk on uneven surfaces one block at a reasonable pace; step at a reasonable pace using one handrail; and work with papers and files. He should avoid extreme cold and heat. Tr. 406-15.

In December 2009, CE Dr. Killian investigated mental status. Plaintiff reported being on parole, alcohol and drug treatment in 2002, and a 1980's bipolar diagnosis when he sought hospitalization to avoid legal charges. He described high energy, excitability, trouble

focusing, and speaking long or loudly. A clinical exam showed no distress, psychomotor abnormalities, or psychotic symptoms. Plaintiff spoke and thought normally and displayed intellectual capacity and excellent judgment along with good awareness, knowledge, and memory. Also, he did not appear physically limited although he used a cane. Dr. Killian diagnosed bipolar disorder and poly-substance dependence, noting daily activities of independent living, house work, socializing, playing cards, and driving. He opined plaintiff's marginal psychiatric symptoms did not preclude work or adjusting appropriately to work conditions. Tr. 401-05.

In February 2010, Disability Determination Services (DDS) Dr. Phay found the record evidenced no severe mental impairment. Tr. 416-29. In March 2010, DDS Dr. Netterville opined plaintiff could do medium work except climbing ladders, ropes, and scaffolds. Tr. 449-57.

In March 2010, Dr. Cates treated a urinary obstruction. Plaintiff described a lot of hip pain and trouble getting around. Dr. Cates ordered lab tests concerning the obstruction and adjusted medications. Dr. Cates confirmed plaintiff knew he needed to quit smoking and drinking. Dr. Cates prescribed no new pain medication, joint therapy, or ambulatory assistive device. Tr. 430-35, 442-45. Also in March 2010, plaintiff sought mental health treatment. Although, clinical signs were good, Dr. Atkinson diagnosed, *inter alia,* severe major depressive disorder, recurrent (based on plaintiff's report) causing seriously limiting symptoms. He prescribed medication. In April 2010, plaintiff returned and set goals of depression remission and better sleep. He was not taking the prescribed medication due to side effects; a replacement was prescribed. In May 2010, plaintiff was not taking medication due to expense. His mental status improved somewhat. At this point, DDS Dr. Kupstas

8

concluded evidence showed plaintiff's mental impairments mildly limited daily activities and moderately limited social functioning, concentration, persistence, and pace. He also found insufficient evidence of a severe mental impairment from December 31, 2001, to June 30, 2007. In June 2010, plaintiff continued therapy and was not taking prescribed medication due to side effects. Progress was noted. Plaintiff was helping his brother on the farm. His mental status was normal and functioning, improved. Tr. 459-492, 536, 557-58, 806, 820.

On the evening of July 1, 2010, a crisis stabilization unit (CSU) admitted plaintiff who described a nervous breakdown in early June, blacking out, and trouble concentrating and sleeping. With a sad affect, he cried, was cooperative, and had a pleasant mood. Using medication and sleep apnea gear, he slept. The next day, mental status was normal. Plaintiff conversed well, mentored peers, and used a walker at all times. After daily progress on mental health goals, he was discharged July 4 with a bright affect and good prognosis. Tr. 559-69, 537-554, 576-79. July and August 2010 progress notes reflected normal mental status and markedly improved functioning (mild limitations). Tr. 570-75, 587-89; *see also* Tr. 555-56, 584-85.

On August 17, 2010, Dr. Cates saw plaintiff for a referral and consultation. Plaintiff had chronic left hip pain (nine, scale of ten) after gardening for an extended period in the heat. He walked slowly and difficultly and could not lift the left leg or rotate the left hip. Dr. Cates found tenderness in the low back and right knee effusion and pain. Judgment, insight, and memory were intact. Dr. Cates assessed "new problems" of bilateral knee pain and fatigue and prescribed medication. Tr. 751-68. Later in August after a motor vehicle accident, plaintiff was in a wheelchair. Dr. Cates found a back spasm and positive SLR (right). Plaintiff was not anxious or depressed. Dr. Cates prescribed pain medication and a

referral to Dr. Christie. In early September 2010, plaintiff decided to use of a rolling walker after falling at home. Based on magnetic resonance imaging (MRI) of moderate lumbar stenosis at L3-L4, Dr. Cates diagnosed lumbar spinal stenosis and adjusted medication. Tr. 621-23, 701-03, 745-50, 769-72, 777-80.

Also, on August 17, 2010, Dr. Cates gave his opinion of physical functioning: Plaintiff's impairments did not affect lifting and carrying. However, they limited sitting, standing, and walking (*i.e.,* plaintiff could sit four hours in an eight-hour day and required an ambulatory assistive device); left hip and bilateral knee DJD limited pushing and pulling with lower extremities; and pain precluded postural activity, constantly interfered with attention and concentration, and required plaintiff to take breaks twice an hour during the work day and to be absent from work more than four days a month. Also, diabetic neuropathy limited manipulation, and chronic obstructive pulmonary disease (COPD) precluded exposure to irritants. Tr. 580-83.

On September 28, 2010, plaintiff had run out of anti-depressant and mental function was gauged moderately limited. Tr. 590-92. By October 26, 2010, he was not depressed, mental status was normal, and function improved. Tr. 593-95. *See also* Tr. 774, 778, 789, 794.

In October 2010, Dr. Lee counseled plaintiff to stop illegal drugs and certain medications pending hip surgery. Dr. Lee thought plaintiff did not directly answer straightforward questions and a plan for alcohol withdrawal during hospitalization might be needed. Plaintiff described chest pain and had an abnormal EKG, but a stress testing showed no ischemia and a peripheral venous Doppler exam detected no deep venous thrombosis. Separately, Dr. Nwaigwe found no significant knee joint abnormality. On November 8, 2010,

Dr. Christie performed hip replacement surgery. Plaintiff tolerated it well. Ambulation was returning in the hospital. Plaintiff was discharged on November 10. Tr. 624-89, 694-700, 704-44, 781-91. By December 20, he was doing well and encouraged to exercise. Plaintiff had moderate pain and a moderate. He used a cane or a walker indoors, climbed stairs, sat for one hour, and used public transportation. Tr. 624-25, 692-93. *See also* Tr. 773-76, 787-88.

Meanwhile, two weeks after surgery in November 2010, plaintiff saw Dr. Cates about intermittent knee pain (seven to nine, scale of ten). Using a walker, he moved slowly and with difficulty. Dr. Cates advised reduced pain medication, a diuretic, and returning in 2011. Tr. 792-96. In January 2011, plaintiff returned and described some hip (but no knee) pain. He walked slowly with a cane. Neurologic and mental signs were normal. Dr. Cates prescribed anxiety medication. Tr. 797-804. Also, plaintiff resumed psychological therapy. Not depressed, he was sleeping well. Tr. 596- 98; *see* Tr. 585-86.

In February 2011, plaintiff was "doing great" and walking two to five miles a day. His incision was well-healed. Plaintiff had a significant range of hip motion (flexion 90 of 125 degrees, lateral 40 of 45, and rotation 20 to 30 of 45). *See* n. 5, *supra.* He had no musculoskeletal effusion or tenderness. No knee limitations were identified. Progress notes showed no pain, a slight limp, use of a cane for long walks, and unlimited walking. Mental signs were normal. Home exercises were prescribed. Tr. 690-91, 805.

Apparently on Dr. Cates's advice, plaintiff began going to a pain clinic. *See* Tr. 31. He described low back pain radiating through the leg (nine, scale of ten). Using a cane, he limped slowly. He responded positively about all possible symptoms, and said all activity worsened pain. A clinical exam showed reduced motion (spine, left hip, knees) and positive SLR and tests for sacroiliac dysfunction. *See Taber's Cyclopedic Medical Dictionary* (21st ed.

2009) (Fabere, Gaensler). The pain clinic staff diagnosed lumbago, radiculopathy, and knee pain. It later found lab results were inconsistent with reported medications. Tr. 604-12, 614-20. A few weeks later, plaintiff reiterated all pain complaints. An exam showed hip and knee tenderness, reduced motion, intact strength, and normal mental status. Plaintiff was advised about RICE therapy (rest, ice, compression, elevation) and not using alcohol with narcotic medication. Tr. 599-603, 613. In March 2011, he reiterated pain complaints and had been doing extra landscaping. He limped. Clinically, knees were tender to palpation and had reduced motion, mild effusion, and increased crepitus; the lumbar spine was tender to palpation; muscle strength and sensation were intact; and mental status was normal. No injection was given pending more testing. Tr. 821-24.

Finally, in April 2011, Dr. Cates furnished plaintiff a work excuse explaining that due to DJD in the knees, plaintiff had "rapidly progressed to poor ambulation." Tr. 825.

<u>Other evidence</u>

In his October 2009 report, plaintiff said he worked in light construction until his health declined. Tr. 142-49. Six feet tall and 296 pounds, he reported he could no longer work due to hips, legs, groin, high blood pressure, diabetes, sleep apnea, and bipolar disorder associated with pain and trouble walking, standing, lifting, bending, and crouching. He had worked as a farmer, foreman, and contract laborer. In 1973, he completed a year at college. Tr. 150-67. Left hip pain began in 1991. He took no pain medication due to lack of insurance. Pain made him depressed and inactive. He had constant hand, arm, knee, and ankle pain from 1991. Hip and groin pain began in 2009. Medication neither relieved pain nor caused side effects. Pain prevented working, food shopping, socializing, and elaborate cooking. He lived with his daughter. He took medication with reminders and did house and yard work

with encouragement. He went out several times a week, drove, grocery shopped, and could handle money. He enjoyed reading and television but his eyes bothered him. He visited family, played cards with friends, and saw doctors. He could remember, understand, follow instructions, and get along with others. He could not comprehend or pay attention long. He got along with authorities and did not handle stress well. From October 2009, he used a cane. After walking 20 feet, he had to rest for a half hour or more. He also rested after cooking five minutes. Tr. 176-89.

His ex-wife spoke with plaintiff often. She learned he woke with pain, struggled all day with pain, and did not sleep nights due to pain. He struggled with self-care, needing reminders to see doctors and take medication. He needed family help with home and yard work but could drive, grocery shop briefly, prepare simple meals, and handle money. He liked to read and watch television. He socialized with family and played cards with friends. He could remember, understand, and follow instructions. On walking 20 feet, he needed to rest an hour. He could not attend for long or follow instructions well. He got along with others, including authorities. He did not handle stress well. From October 2009, he needed a cane. Tr. 168-75.

His brother reported that plaintiff read newspapers; did not need reminders on self-care or taking medication and cooked complete dinners regularly. He visited friends at the farmer's market and played cards at local businesses less often. He could not bend or climb stairs and took longer than usual whenever walking. His problems did not limit sitting, squatting, kneeling, reaching, finishing tasks, concentrating, or using his hands. His mind was not affected. His health declined since 2007; *i.e.,* he worked with pain in 2008, and saw a doctor about it in 2009. Tr. 190-97.

In July 2010, plaintiff reported depression, left hip, and right leg, were worse, and his doctor had prohibited all activity from October 2009. He used a walker, could barely drive, could hardly walk or sit due to pain, could not remember, and had to eat fast food. His mind raced, and he thought of suicide. Tr. 218-23; *see also* Tr. 202-08.

At the ALJ hearing in 2011, plaintiff testified he lived alone and worked until May 2007 hanging vinyl siding. He did not know why Dr. Cates provided him an excuse from work in April 2011. He recently helped with landscaping but was abed through the next day. He drove. He used a rolling walker at the hearing and last used it in February 2011 to see his doctor. He used it under doctor's orders. Previously he used it constantly, but currently about four times a year. After Dr. Christie released him, he started going to a pain clinic. His memory was fuzzy. He could not work due to needing knee replacements, spinal DJD, and a pulled groin muscle. After hip surgery, he had walked two to five miles a day, but now only 100 to 200 yards because of knee pain. Even with knee replacements, pain might prevent working. He had owned a farm with his brother until about 2004, and he smoked. Tr. 28-36.

Plaintiff added that hip surgery resolved left hip problems but his right hip sometimes hurt. He quit siding work in 2007 when unable to climb a ladder with leg and knee problems. His left knee was painful (eight, scale of ten) and his right knee really painful (fifteen). From the 1980's he had trouble on concrete floors and it affected walking in 1999. In early 2007, knee pain was less (ten). He used a cane for hip pain from October 2009. He struggled with anxiety and depression most of his life. He stayed in bed three days a week and, without medication, slept two hours at night. Pain woke him. He had trouble staying focused and at times did not recall recent events. Tr. 37-41.

VE Smith testified that plaintiff's past work exceeded the RFC posited in the ALJ's first hypothetical question. However, other jobs were available to someone like plaintiff who could do a limited range of medium work; except for climbing (ladders, ropes, scaffolds), crawling, kneeling more than occasionally, making executive level decisions, adapting to more than occasional work place changes, or working around unprotected heights and moving machinery; and able to perform other postural activities frequently, simple and detailed instructions, and better with things (than people) while remaining able to interact with the public, coworkers, and supervisors. The available jobs were grocery bagger (8,000 locally, over 100,000 nationally) and linen room attendant (1,300 locally and over 60,000 nationally). These jobs were available if they required operating foot controls only frequently. However, if all limitations alleged in plaintiff's testimony were assumed, no jobs were available. Tr. 41-44.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision

must stand if substantial evidence supports the conclusion reached.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

> 2) A claimant who does not have a severe impairment will not be found to be disabled.

> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.

> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.

> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

## C. Plaintiff's Statement of Errors

Plaintiff takes issue with the ALJ's rejection of his treating physician's opinion. On August 17, 2010, three weeks prior to plaintiff's left hip replacement surgery, Dr. James W. Cates, M.D., opined that plaintiff's severe arthritis of the left hip and both

knees significantly limited his exertional abilities to do work-related activities, such that plaintiff could not perform even sedentary work. (Tr. 580-83) Plaintiff argues that this opinion should have been given substantial weight, inasmuch as it was sufficiently supported by medical findings in the record. Citing, e.g., Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284 (6th Cir. 1994). As reflected in the above review of the medical record, there are certainly objective indicia of the severity of plaintiff's osteoarthritis in his hip and knee joints, indicating in particular the need for surgical treatment of his left hip around the time that Dr. Cates offered his opinion. However, as noted by the ALJ, there is also evidence that plaintiff's hip symptomatology was significantly reduced by this surgical intervention and the course of physical therapy that followed it, allowing him to walk between two and five miles daily within three months of the surgery. (Tr. 35, 690) Moreover, as further noted by the ALJ, the record also reflects plaintiff's report that he had been doing landscaping three weeks prior to the hearing; that he helped someone with vinyl siding just three days prior to the hearing; and, that he had been observed by consultative examiner Dr. Keown to demonstrate guarded effort and "exaggeratory dramatic expression of difficulties ambulating while being observed," as opposed to moving "with greater ease when unaware of being observed[.]" (Tr. 408) Furthermore, the record shows that plaintiff's knee symptoms had been successfully addressed in the past with oral medications and cortisone injections. While there are indications in the testimonial and medical evidence that the condition of plaintiff's knees, particularly his right knee, had deteriorated in the weeks leading up to the hearing before the ALJ (Tr. 35-36, 825), plaintiff testified that he would be returning to his doctor the following week for a cortisone shot, and would be given a series of such shots at intervals until he had knee replacement surgery, to allow him to walk more easily. (Tr. 36)

It is for the ALJ to weigh the evidence, and this Court may not re-weigh it upon judicial review. Bradley v. Sec'y of Health & Human Servs., 862 F.2d 1224, 1227 (6th Cir. 1988) (citing Myers v. Richardson, 471 F.2d 1265, 1267-68 (6th Cir. 1972)). On the record before him, the ALJ appropriately gave minimal weight to the pre-2009 medical evidence which established only the historical basis for plaintiff's claims, without any particular opinion evidence to inform the disability inquiry, while the more significant evidence of his impairments and their severity adduced in 2009 and beyond was more closely scrutinized. Plaintiff cites the early establishment of his hip and knee impairments in the radiographic evidence and points to the eventual need for hip replacement surgery as proof requiring the adoption of Dr. Cates' assessment that these degenerative conditions had worsened to the point of disability. However, the medical proof in this case is simply not such that the ALJ can be found to have erroneously refuted the existence of a disabling lower body impairment which has lasted or could be expected to last at least 12 continuous months. 42 U.S.C. § 423(d)(1). There is evidence that plaintiff's left hip pain significantly worsened in the 4 or 5 months leading up to his surgery (Tr. 627), and evidence that it was significantly alleviated within three months of that surgery (Tr. 690). Moreover, though it may be a logical supposition that months of favoring his left hip in the wake of surgery exacerbated the arthritic pain and limitations in plaintiff's right knee, at the time the ALJ rendered his decision there was testimony supporting the belief that such knee symptoms were soon to be addressed by short term as well as long term treatment. (Of course, if that proved to not be the case, plaintiff would be able to file a new claim for supplemental security income benefits.) In any event, the ALJ appropriately viewed the available objective medical data not in a vacuum, but in juxtaposition with the other recorded observations in

the medical and testimonial record which tended to refute the notion that plaintiff's obesity and degenerative osteoarthritis had permanently cost him his ability to work from the time that joint replacement surgery was indicated.

Ultimately, this case presents a conflict between evidence of significant impairments to plaintiff's weightbearing joints, and evidence that the limitations caused by these impairments are not as significant as might be expected, following surgical and other medical treatment.[3] It is the ALJ's province to resolve conflicts in the evidence, Baldwin v. Astrue, 2009 WL 4571850, at *4 (E.D. Ky. Dec. 1, 2009) (citing Burton v. Halter, 246 F.3d 762, 775 (6th Cir. 2001)), and in particular with regard to live witness testimony, an ALJ's credibility determination is due considerable deference on judicial review since the ALJ, unlike the Court, has the opportunity to observe the plaintiff while testifying. E.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). The undersigned finds no error in the ALJ's weighing of the evidence here. Finally, on this record where (1) the nontreating medical sources cited by the ALJ disagreed with the assessment of the treating physician and were not offered at the point when plaintiff's symptoms were deemed to justify surgery, as was the treating physician's opinion; and (2) external factors cited by the ALJ called the plaintiff's credibility into question, the undersigned finds that the requirement of giving good reasons for rejecting the treating physician's opinion, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), has been met.

---

[3]For instance, in followup from his hip surgery, plaintiff was noted on February 3, 2011, to be "doing great - walking 5 miles ... despite severe [osteoarthritis] both knees." (Tr. 690)  Four days later, at his initial visit to a pain clinic, plaintiff was noted to display a slow, limping gait with a cane in his right hand and favoring his left hip. (Tr. 605)

Plaintiff alternatively and briefly argues that plaintiff's lower body impairments, if not totally disabling, would not allow for the performance of more than sedentary work, and that such a residual functional capacity would require a finding of disability pursuant to the applicable grid rules. However, in light of the opinion evidence and the record as a whole, the ALJ's finding of plaintiff's RFC for a range of medium work is substantially supported. Accordingly, plaintiff's argument for disability under the sedentary grid rules is without merit.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 3rd day of June, 2015.

 s/ John S. Bryant

JOHN S. BRYANT

UNITED STATES MAGISTRATE JUDGE